United States District Court
Southern District of Texas
**ENTERED**
July 31, 2019
David J. Bradley, Clerk

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| VALENTIN MUNIZ-SAAVEDRA, | § | |
|    Petitioner, | § | |
| | § | |
| v. | § | Civil Action No. 1:18-cv-102 |
| | § | Criminal Case No. 1:13-cr-736-1 |
| UNITED STATES OF AMERICA, | § | |
|    Respondent. | § | |

## MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

The Court is in receipt of Valentin Muniz-Saavedra's "Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody" (Dkt. No. 1) and his corresponding "Memorandum of Law in Support of a Motion to Vacate, Set Aside, or Correct Sentence Under 28 U.S.C. § 2255" (Dkt. No. 2) (hereinafter, collectively, Muniz's "Motion" or "§ 2255 Motion"). For the reasons provided below, it is recommended that the Court **DISMISS** Muniz's Motion and direct the Clerk of Court to close this case. It is further recommended that a Certificate of Appealability not issue.

### I.    Jurisdiction

This Court has jurisdiction over Muniz's § 2255 Motion pursuant to 28 U.S.C. §§ 1331, 2255.

## II.   Background

On September 24, 2013, a grand jury indicted Muniz on the following six counts: (1) Conspiracy to Possess with Intent to Distribute More Than 5 Kilograms of Cocaine and More Than 50 Grams of Methamphetamine in Violation of 21 U.S.C. §§ 846, 841(a)(1), 841 (b)(1)(A); (2) Possession with Intent to Distribute More Than 5 Kilograms of Cocaine in Violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 18 U.S.C. § 2; (3) Possession with Intent to Distribute More Than 50 Grams of Methamphetamine in Violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 18 U.S.C. § 2; (4) Conspiracy to Import More Than 5 Kilograms of Cocaine and More Than 50 Grams of Methamphetamine in Violation of 21 U.S.C. §§ 963, 952(a), 960(b)(1); (5) Importation of More Than 5 Kilograms of Cocaine in Violation of 21 U.S.C. § 952(a), 960(b)(1), and 18 U.S.C. § 2; and (6) Importation of More Than 50 Grams of Methamphetamine in Violation of 21 U.S.C. §§ 952(a), 960(b)(1), and 18 U.S.C. § 2.  Cr. Dkt. No. 7.[1]  Muniz entered a plea of not guilty.  Cr. Dkt. No. 129 at 16.  A jury trial followed, beginning on February 24, 2014 and ending on February 28, 2014.  *See* Cr. Dkt. Minute Entries Dated Feb. 24 – Feb. 28, 2014.

Muniz drove a vehicle across the United States-Mexico border on August 31, 2013.  Cr. Dkt. No. 120 at 16.[2]  At the United States port of entry, a Customs and Border Protection Officer—Jose Escobedo—encountered Muniz driving a vehicle.

---

[1] "Cr. Dkt. No." refers to entries on the criminal docket sheet for Muniz's criminal case, 1:13-cr-736-1. "Dkt. No." refers to entries on the civil docket sheet for the instant petition, 1:18-cv-102.

[2] The facts and information laid out in the Background section of the Report and Recommendation were largely taken from the trial transcript of Muniz's criminal case, including testimony of the law enforcement officers involved.  *See United States v. Valentin Muniz-Saavedra*, Case No. 1:13-cr-736-1 (S.D. Tex. 2013).

Cr. Dkt. No. 117 at 19−20.   Officer Escobedo requested Muniz's identification documents, and asked the purpose of Muniz's trip.  *Id.*  Muniz told Officer Escobedo that he had borrowed the vehicle from a friend.  *Id.*  Officer Escobedo asked Muniz to open the door and trunk.  Upon observing that the vehicle did not contain any personal items, Officer Escobedo utilized a density meter on the vehicle.  Cr. Dkt. No. 120 at 20−21.  The density meter readings indicated certain areas of the vehicle were abnormally dense.  *Id.* at 22.  Officer Escobedo requested a canine inspection of the vehicle.  *Id.*  Officer Escobedo then referred Muniz's vehicle to secondary screening.  *Id.* at 23.

During secondary screening, the vehicle underwent a "systematic K-9 inspection[.]"  Cr. Dkt. No. 120 at 22.  The canine alerted at the same area on the vehicle that had produced abnormal readings on the density meter.  *Id.* at 23−24; *see also* Cr. Dkt. No. 117 at 53.  Then, multiple agents inspected the vehicle and discovered packages hidden in the quarter panel of the vehicle, under the hood, and in the roof.  Cr. Dkt. No. 58 at 1−7; Cr. Dkt. No. 117 at 53, 55.  The packages contained a total weight of approximately 18 kilograms of cocaine and 5.5 kilograms of methamphetamine.  Cr. Dkt. No. 37 at 1.

Following the discovery of the packages, Homeland Security Investigations Special Agents Oscar Lara and Loukas Mihalos interviewed Muniz.  Cr. Dkt. No. 117 at 88, 90.   Muniz told them that a friend—Mario Arrellano—had called him earlier that morning and "asked [h]im for a favor, basically the favor being that [Arellano] requested if Mr. Muniz could drive a vehicle across the Bridge for him."

*Id.* at 99; *see also* Cr. Dkt. No. 118 at 21−22.  Agent Lara reminded Muniz that he had initially said he borrowed the vehicle from a friend because Muniz's vehicle was being repaired.  Cr. Dkt. No. 117 at 113.  Muniz explained the deviation by stating that he was nervous when answering initial questions.  *Id.*; *see also* Cr. Dkt. No. 120 at 18, 22.  Muniz then told the agents that he would provide them information about the friend who he believed owned the car (Refugio Garcia) and the friend who had asked him to drive it to the United States (Mario Arellano).  Muniz provided the agents information about Arellano and Garcia, but none of the information Muniz provided led to significant discoveries for law enforcement.   Muniz also called Arellano in the presence of Agent Lara and Agent Victor Hugas, but Arellano did not answer.  Cr. Dkt. No. 58-2 at 5−6.

While Muniz was in jail, he placed multiple calls to his wife, Consuelo Muniz Sibaja.  Agents obtained transcripts of two calls they deemed significant.  Cr. Dkt. No. 58-1 at 29−37.  The first significant call took place late in the evening of August 31, 2013, the same day that Muniz had been apprehended at the port of entry.  During that call, Muniz told Sibaja that "Mario Arellano" used multiple names, and that he did not believe "Mario Arellano" was his real name.  *Id.* at 29−32.  Muniz had not told any agents that he believed "Mario Arellano" was an alias.  The second significant call took place the next day.  *Id.* at 33−37.  During that call, Sibaja urged Muniz to offer to take "an anti-doping" test and "a lie detection test[.]"  *Id.* at 36.  Muniz simply agreed with Sibaja's suggestions.  *Id.*  The Government argued that

Muniz's lackluster responses indicated that he was hesitant or unwilling to take a drug test or submit to a lie detector test.  Cr. Dkt. No. 120 at 26–27.

During the trial, the primary issue was whether Muniz had "knowledge" that the vehicle contained controlled substances.  *See* Cr. Dkt. No. 116 at 133, 136; *see also* Cr. Dkt. No. 120 at 10–12 (Muniz testifying that he was not guilty because he "did not know anything about" the charged conduct); *id.* at 121–22.  The Government emphasized that Muniz's explanation of events had changed multiple times, and that he had concealed information about Arellano and Garcia from the agents.  *Id.* at 110, 128–33.  The Government also argued that, based on the circumstances, it was implausible that Muniz had no knowledge of the drugs in the vehicle.  *Id.* at 127–28; *see also id.* at 16–22 (Government's cross-examination of Muniz, emphasizing inconsistencies in what he told agents at the time of his arrest.  Evidence at trial included phone records indicating the frequency of contact between Muniz and Arellano, testimony from experts on drug trafficking, audio recordings of the phone calls between Muniz and Sibaja, a rental contract for a home that Muniz had signed on Arellano's behalf, testimony from multiple agents who were involved in Muniz's detention and arrest, and testimony from Muniz.[3] The Government also submitted evidence of debts Muniz owed to a furniture store and Muniz's limited income.  Cr. Dkt. No. 58 at 22–40.

---

[3] Cr. Dkt. No. 58-1 at 28–37 (transcripts of calls between Muniz and Sibaja); Cr. Dkt. No. 58-1 at 39–40 (call logs of one of Arellano's phones); Cr. Dkt. No. 58-2 at 1–3 (call logs of Arellano's second phone); Cr. Dkt. No. 58-2 at 5–6 (transcript of Muniz's attempts to call Arellano in the presence of law enforcement); Cr. Dkt. No. 117 at 15–43 (testimony of Officer Escobedo); Cr. Dkt. No. 117 at 43–60 (testimony of Officer Carlos Jaramillo); Cr. Dkt. No. 117 at 61–67 (testimony of Officer John Paul Munivez); Cr. Dkt. No. 117 at 69–83 (testimony of Agent James Wimberley); Cr. Dkt. No. 117 at 84–140 (testimony of Agent Oscar Lara); Cr. Dkt. No. 118 at 6–135 (testimony of Agent Loukas Mihalos); Cr. Dkt. No. 118 at 137–94 and Cr. Dkt. No. 120 at 8–64 (testimony of Muniz).

The jury returned a guilty verdict on Counts 2, 3, 5, and 6.  Cr. Dkt. No. 52. On December 1, 2015, Senior United States District Judge Hilda Tagle sentenced Muniz to 210 months of imprisonment on each count of conviction, to be served concurrently.  Cr. Dkt. No. 122 at 14−15.  Muniz, through counsel, appealed to the Fifth Circuit Court of Appeals, which affirmed his conviction and sentence on May 19, 2017.  *See* Cr. Dkt. No. 132.  Muniz filed a petition for writ of certiorari with the United States Supreme Court.  On December 11, 2017, the Supreme Court denied certiorari.[4]  Cr. Dkt. No. 133.  During trial and throughout his direct appeal, Muniz was represented by Attorney Edward A.  Stapleton.  *See* Cr. Dkt. No. 19.

On June 20, 2018, Muniz placed his § 2255 Motion in the prison mail system.[5]  Dkt. No. 1 at 12−13; Dkt. No. 2 at 24.  The Court received Muniz's Motion on June 25, 2018.  *See* Dkt. No. 1 at 1.  Construing his pro se pleadings liberally, Muniz's Motion raises the following grounds for relief, each of which is an ineffective assistance of counsel claim:

1. Stapleton was ineffective for failing to call Muniz's wife, Consuelo Muniz Sibaja, to testify.  *See* Dkt. No. 1 at 4; Dkt. No. 2 at 11−13.

2. Stapleton was ineffective for "fail[ing] to timely and diligently procure" and present "evidence to the jury to rebut the [G]overnment's allegation that because [Muniz] was a cocaine user[,] [Muniz] should have known of the drugs found hidden in the vehicle[.]"  Dkt. No. 1 at 4.

---

[4] Because Muniz filed a petition for writ of certiorari, his conviction became final—and his one-year limitations period to file the instant petition began to run—on the date that the Supreme Court denied certiorari.  *See United States v. Thomas*, 203 F.3d 350, 356 (5th Cir. 2000).

[5] Where a prisoner is proceeding pro se, courts consider documents "filed" on the date the prisoner provided the document to prison authorities for mailing.  *See Spotville v. Cain*, 149 F.3d 374, 378 (5th Cir. 1998) (noting that documents mailed from pro se prisoners are deemed "filed" on the day they are placed in the prison mailing system, or otherwise provided to prison authorities for mailing); *see also United States v. Young*, 966 F.2d 164, 165 (5th Cir. 1992) (applying the "prisoner mailbox rule" to pro se § 2255 motions).

3. Stapleton was ineffective for failing to obtain and submit "evidence of [Muniz's] financial record in the form of credit reports, bank account statements, employment payroll records and unemployment records" because such evidence would have demonstrated to the jury that Muniz's "economic situation . . . was in no way consistent with that of an individual receiving large amounts of cash because of drug trafficking activities."  Dkt. No. 2 at 18.

4. Stapleton was ineffective for failing to "present to the jury during trial medical records and a certified medical diagnose of [Muniz's] severe respiratory ailment in the form of sinusitis."  Dkt. No. 1 at 5 (errors in original).

5. Stapleton was ineffective for failing to argue that Muniz "in a timely and candid manner provided the law enforcement officers with post-arrest information that if followed up by the arresting officers could have lead to the arrest of the individuals truly responsible for the drugs found hidden in the vehicle[.]"  Dkt. No. 1 at 7 (error in original).

The Government filed its "Response to Motion for Relief Under 28 U.S.C. § 2255" (hereinafter, the Government's "Response") on November 08, 2018.  Dkt. No. 16.  In its Response, the Government argues that Muniz has not met his burden of showing "that [Stapleton] performed deficiently and that [Muniz] suffered prejudice as a result."  *See* Dkt. No. 16 at 1–2 (referencing *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)).

### III.   Legal Standards

Pursuant to 28 U.S.C. § 2255, a defendant may move to vacate, set aside, or correct his sentence if: (1) the sentence was imposed in violation of the Constitution or the laws of the United States; (2) the district court was without jurisdiction to impose the sentence; (3) the sentence imposed was in excess of the maximum authorized by law; or, (4) the sentence is otherwise subject to collateral attack.  28

U.S.C. § 2255(a).   The nature of a § 2255 challenge is extremely limited, being reserved for instances of constitutional or jurisdictional magnitude.   *United States v. Shaid*, 937 F.2d 228, 232 (5th Cir. 1991).   If an error is not of constitutional magnitude, the movant must show that the error could not have been raised on direct appeal and would, if condoned, result in a complete miscarriage of justice. *United States v. Smith*, 32 F.3d 194, 196 (5th Cir. 1994).

The "Sixth Amendment guarantees a[ll] defendant[s] the right to have counsel present at all 'critical' stages of the criminal proceedings" instituted against them.   *Missouri v. Frye*, 566 U.S. 134, 140, 132 S. Ct. 1399, 182 L. Ed. 2d 379 (2012) (citing *Montejo v. Louisiana*, 556 U.S. 778, 786, 129 S. Ct. 2079, 173 L. Ed. 2d 955 (2009)).   Critical stages include not only trial, but also pretrial proceedings.   *Lafler v. Cooper*, 566 U.S. 156, 162, 132 S. Ct. 1376, 182 L. Ed. 2d 398 (2012); *Padilla v. Kentucky*, 559 U.S. 356, 373, 130 S. Ct. 1473, 176 L. Ed. 2d 284 (2010); *Hill v. Lockhart*, 474 U.S. 52, 57, 106 S. Ct. 366, 88 L. Ed. 2d 203 (1985).   The constitutional standard for determining whether a defendant has been denied effective assistance of counsel at a critical stage of his proceedings was announced by the Supreme Court in *Strickland v. Washington*.   In that case, the Supreme Court explained:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components.   First, the defendant must show that counsel's performance was deficient.   This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.   Second, the defendant must show that the deficient performance prejudiced the defense.   This requires showing that counsel's

errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland*, 466 U.S. at 687.

In order to demonstrate that his attorney's performance was constitutionally deficient, a convicted defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Williams v. Taylor*, 529 U.S. 362, 390−91, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000); *see also Darden v. Wainwright*, 477 U.S. 168, 184, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986); *Strickland*, 466 U.S. at 687−88; *Lackey v. Johnson*, 116 F.3d 149, 152 (5th Cir. 1997); *Andrews v. Collins*, 21 F.3d 612, 621 (5th Cir. 1994). A convicted defendant carries the burden of proof and must overcome a strong presumption that the conduct of his trial counsel falls within a wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 687−91; *Jones v. Cain*, 227 F.3d 228, 230 (5th Cir. 2000).

In reviewing counsel's performance, the Court must be "highly deferential," making every effort "to eliminate the distorting effects of hindsight," and must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" *Strickland*, 466 U.S. at 689. Any deficiencies in counsel's performance must be prejudicial to the defense to constitute ineffective assistance under the Constitution. *Id.* at 691−92. To establish that he suffered prejudice, a convicted defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 693. A reasonable probability is one sufficient to undermine confidence in the outcome. *Williams*, 529 U.S. at 391; *Strickland*, 466 U.S. at 694.

The prejudice prong of the *Strickland* analysis focuses on whether counsel's deficient performance rendered the result of the trial unreliable, or rendered the proceeding fundamentally unfair.  "Unreliability or unfairness does not result if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him."  *Williams*, 529 U.S. at 393 n.17; *see also Strickland*, 466 U.S. at 692−93.

Because a convicted defendant must satisfy both prongs of the *Strickland* test, a failure to establish either will ordinarily make it unnecessary to examine the other.  *See, e.g.*, *Strickland*, 466 U.S. at 700; *Ransom v. Johnson*, 126 F.3d 716, 721 (5th Cir. 1997); *United States v. Seyfert*, 67 F.3d 544, 547 (5th Cir. 1995); *Armstead v. Scott*, 37 F.3d 202, 210 (5th Cir. 1994).  Failure to establish that counsel's performance fell below an objective standard of reasonableness renders the issue of prejudice moot.  *United States v. Hoskins*, 910 F.2d 309, 311 (5th Cir. 1990); *Thomas v. Lynaugh*, 812 F.2d 225, 229−30 (5th Cir. 1987).  It is also generally unnecessary to consider whether counsel's performance was deficient where there is an insufficient showing of prejudice.  *Black v. Collins*, 962 F.2d 394, 401 (5th Cir. 1992); *Martin v. McCotter*, 796 F.2d 813, 821 (5th Cir. 1986).

## IV.   Discussion

As noted above, Muniz's Motion raises five distinct claims for relief rooted in an allegation that his trial counsel, Ed Stapleton, provided him with ineffective

assistance of counsel.[6]  Muniz alleges the following constitute ineffective assistance: (1) failure to call Muniz's wife as a witness; (2) failure to refute the Government's allegation that since Muniz had used cocaine previously, Muniz had knowledge of the drugs found in the vehicle; (3) failure to submit particular financial documents to refute the Government's argument that Muniz had an economic motive to engage in drug trafficking; (4) failure to submit medical records of Muniz's purported sinusitis as an alternative explanation for Muniz's "sniffling" on the day of his arrest; and (5) failure to argue that law enforcement did not properly follow up on information Muniz provided to them, which would have exonerated him.  Muniz argues that, but for Stapleton's alleged failures, he would have been acquitted by the jury on all six counts.  *See* Dkt. No. 2 at 23.  Each claim of ineffective assistance will be addressed below.

### A. Muniz's Claim That Stapleton Was Ineffective for Failing to Call Consuelo Muniz Sibaja, Muniz's Wife, to Testify

In his first claim, Muniz argues that Stapleton was ineffective for failing to call Sibaja as a witness.  Muniz states that Sibaja would have provided testimony that Muniz suffered from sinusitis, and that although Muniz had previously used cocaine, she did not believe he had used cocaine "recently."  Dkt. No. 2 at 11.  Muniz also states that Sibaja would have "offered to the jury a factual account of the events that followed" Muniz's arrest, including his "willingness to debrief the authorities and assist in the identification and locating of the individuals that were the true responsibles for the drug found hidden in the vehicle."  *Id.* (errors in

---

[6] Because he is proceeding pro se, Muniz's pleadings are liberally construed. *Estelle v. Gamble*, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).

original).  Muniz contends that this testimony would have impacted the outcome in his case because it "would have provided the jury with a more complete understanding of the facts of the case[.]"  *Id.* at 12.  However, Muniz has not met his burden of showing that Stapleton's decision not to call Sibaja constituted ineffective assistance of counsel.

On federal habeas review, "complaints based upon uncalled witnesses [a]re not favored because the presentation of witness testimony is essentially strategy and thus within the trial counsel's domain, and . . . speculations as to what these witnesses would have testified is too uncertain."  *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985). Further, to demonstrate the requisite prejudice for a complaint of this kind, the movant must show that the witness would have testified at trial, that the testimony would have been favorable, and a reasonable probability that the testimony of the uncalled witness would have affected the result of the trial.  *Id.* at 602−03.

Although Muniz submitted a short affidavit signed by Sibaja indicating that she would have testified at the trial, Muniz has not established that her testimony would have been favorable to him, nor a reasonable probability that it would have affected the outcome of his trial.  Muniz claims that Sibaja's testimony would have addressed the following: (1) that Muniz suffered from sinusitis for more than 28 years, and that as a result he displayed "demeanor that is totally consistent with symptoms of a strong flu or cold, but not necessarily the use of cocaine"; (2) that, to her knowledge, Muniz "had not been using cocaine" at the time of his arrest; (3) that

Muniz was willing "to debrief the authorities and assist in the identification" of others Muniz told her were involved; and (4) who Muniz "truly was."  Dkt. No. 2 at 11–12.[7]

Muniz has not demonstrated how, in light of his own testimony and admissions to using cocaine (Cr. Dkt. No. 118 at 146–49), Sibaja's testimony about his sinusitis would have affected the outcome of the trial.  As Officer Escobedo testified, Muniz and the vehicle he was driving were sent for further inspection at the border only after the use of a density meter indicated abnormal changes in the vehicle's density.  Cr. Dkt. No. 117 at 21–22.  Before being sent for additional screening, Officer Escobedo also testified that a canine officer alerted at Muniz's vehicle, indicating the presence of a controlled substance.  *Id.* at 22–23.  Contrary to the assertion in his Motion, Muniz was not sent for additional screening based on his sniffing or wiping of his nose.

Agent Lara was the only law enforcement officer who testified about Muniz sniffling or wiping his nose; but Agent Lara was not called to assist agents at the border until *after* cocaine and methamphetamine had been discovered in the vehicle.  Cr. Dkt. No. 117 at 87.   Agent Lara only testified briefly about Muniz's nasal sniffling and wiping.  *Id.* at 125–26.  Agent Lara stated that he had observed Muniz "snorting, sniffing as if he had a cold" and "kept wiping his nose" throughout

---

[7] The Court notes that in her affidavit, Sibaja did not address what her testimony would have been. Instead, this information comes from Muniz himself.  Courts generally disfavor speculation of what a witness's testimony would have been if the only source is the habeas petitioner.  *See Lockhart v. McCotter*, 782 F.2d 1275, 1282 (5th Cir. 1983) (noting that courts view claims of ineffective assistance with great caution if "the only evidence of a missing witness'[s] testimony is from the defendant").

the time he was riding with Agent Lara.  *Id.*  Said differently, Agent Lara did not

testify that Muniz's sniffling had an impact on the vehicle search or arrest.  He

testified that based on the observation of Muniz's sniffling, he asked Muniz "if he

snorted cocaine."  *Id.* at 126.  Agent Lara testified that Muniz "hesitated for a little

bit and then he responded by saying, yes, that he did snort cocaine . . . but that he

also has . . . sinus problems."  *Id.* at 126–27.  Following this testimony, Stapleton—

Muniz's counsel—requested that the jury be instructed that Agent Lara's testimony

about Muniz's admission to using cocaine was "not to be considered for general

character or trustworthiness of [Muniz] and it's solely for the issue of motive in this

case."  *Id.* at 127.  The judge instructed the jury in accordance with Stapleton's

request.  Muniz's own testimony later corroborated Agent Lara's recollection of this

conversation.  Cr. Dkt. No. 118 at 149.  Thus, even if Sibaja had been called to

testify that Muniz had sinusitis, such testimony would not have impacted the

outcome of his trial.

Similarly, Sibaja's proposed testimony that, to her knowledge, Muniz had not

used cocaine recently would not have benefited Muniz.  Muniz testified that he had

used cocaine "from time-to-time" but was "able to hide that from [his] wife[.]"  Cr.

Dkt. No. 118 at 147.  If Stapleton had called Sibaja, the Government may have used

her testimony to emphasize Muniz's history of lying about his drug use.  *See* Cr.

Dkt. No. 120 at 26–28 (cross examination of Muniz during which the Government

asked him repeatedly about lying to his wife about his drug use).  In fact, it would

have been entirely reasonable for Stapleton to decline to call Sibaja for this very

reason; if Sibaja testified that she did not believe her husband had used cocaine recently, the jury would have had an additional basis on which to conclude that Muniz was dishonest.  *See Brown v. Thaler*, 684 F.3d 482, 499 (5th Cir. 2012) (holding that counsel is not ineffective for failure to submit "double-edged" evidence that may hurt defendant's case).

Muniz also contends that Sibaja would have testified about Muniz's willingness to assist authorities.  Dkt. No. 2 at 8–9.  However, the jury heard testimony from multiple witnesses regarding information Muniz provided to the officers.  *See* Cr. Dkt. No. 117 at 90–105, 109–28 (Agent Lara's testimony regarding Muniz's attempts to assist law enforcement); Cr. Dkt. No. 118 at 13–14, 19–20, 28–38, 45 (Agent Mihalos's testimony regarding Muniz's attempts to assist law enforcement); Cr. Dkt. No. 118 at 190–93 (Muniz's testimony regarding his attempts to assist law enforcement).  Sibaja was not with Muniz when he was arrested; she did not have additional information to provide to the jury beyond what had already been presented.  In sum, Muniz has not met his burden to show that Sibaja's testimony would have been relevant or beneficial, or that Stapleton's failure to call her constituted ineffective assistance.  Muniz is therefore not entitled to relief on this basis.

### B. Muniz's Claim That Stapleton Was Ineffective for Failing to Present Evidence to Refute the Government's Allegation that Because Muniz Was a Cocaine User, Muniz Should Have Known of the Drugs Found in the Vehicle

In his second claim, Muniz contends that Stapleton should have refuted the Government's contention that Muniz's cocaine use was related to his knowledge of

the drugs in the vehicle. However, this claim does not accurately reflect the proceedings. Stapleton objected to the admission of this evidence, and the trial court overruled each objection. *See, e.g.*, Cr. Dkt. No. 117 at 105−08. Stapleton also stated, during his closing argument, that "much of what [the jury] ha[s] heard does not go to whether or not [Muniz] had the knowledge of whether or not the drugs were in the van," including Muniz's history of illegal drug use. Cr. Dkt. No. 120 at 112; *see also* Cr. Dkt. No. 120 at 121−22. Thus, Stapleton made the exact argument that Muniz alleges he did not make. If Muniz is claiming that evidence exists to refute the Government's argument, he has not identified what evidence Stapleton should have presented. This claim is merely conclusory, and should be denied. *See Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000) ("[C]onclusory allegations of ineffective assistance of counsel do not raise a constitutional issue in a federal habeas proceeding.").

### C. Muniz's Claim That Stapleton Was Ineffective for Failing to Submit Evidence to the Jury About Muniz's Economic History

Muniz's third claim is that Stapleton should have submitted evidence to the jury regarding his economic status. However, Stapleton made arguments and presented evidence throughout trial refuting the Government's assertion that Muniz had an economic motive to traffic drugs. For instance, in his opening statement, Stapleton stated that Muniz "was out of work at the time that" he was arrested, but that Muniz's "wife was working[.]" Cr. Dkt. No. 116 at 134. Stapleton also explained to the jury that Muniz and his wife "were living modestly," and that Muniz had consistently "made small payments in order to pay" off his debts to a

furniture store, notwithstanding his unemployment. *Id.* When Muniz testified, Stapleton asked him directly about his economic circumstances. Muniz explained that he was able to keep current on his debts to the furniture store because he "was receiving unemployment and [his] wife was also getting money coming in." Cr. Dkt. No. 118 at 168. Muniz also testified that, during the time he was unemployed, he believed he had a very high chance of getting rehired soon due to his experience and skill. *Id.* at 169−70.

Because evidence regarding Muniz's financial circumstances was presented to the jury, Muniz fails to show that Stapleton's decision to not present more of the same was deficient. Muniz has also not demonstrated that the outcome of his trial would have been any different if Stapleton had presented additional evidence of his financial status. Muniz's allegations are insufficient to overcome the presumption that Stapleton's decision not to present additional evidence on this subject was sound trial strategy. *See Strickland*, 466 U.S. at 688. Accordingly, this claim should be dismissed.

### D. Muniz's Claim that Stapleton Was Ineffective for Failing to Introduce Medical Records Documenting Muniz's Sinusitis

Muniz's fourth claim is that Stapleton failed to introduce medical records that Muniz suffered from sinusitis; however, it is unclear how this information would have impacted Muniz's trial. The jury heard testimony from Agent Lara that Muniz told him that he suffered from a sinus condition. Cr. Dkt. No. 117 at 125. The Government did not refute this point. Moreover, whether Muniz suffered from sinusitis was irrelevant to the jury's determination of guilt—Stapleton made this

point explicitly during his closing argument.  *See* Cr. Dkt. No. 120 at 117−18.  The central issue at trial was whether Muniz had knowledge of the presence of cocaine and methamphetamine in the vehicle.  *See* Cr. Dkt. No. 120 at 113−14, 121.  Muniz has failed to show that documentary evidence about his medical condition would have impacted the outcome of his trial.  This claim should also be dismissed.

### E. Muniz's Claim that Stapleton Was Ineffective for Failing to Argue that Law Enforcement Did Not Properly Follow Up on Information Muniz Provided Shortly After His Arrest

In his final ground for relief, Muniz asserts that Stapleton did not "argue before the jury during trial" that law enforcement did not properly follow up on information Muniz provided.  Dkt. No. 1 at 7; *see also* Dkt. No. 2 at 20−22.  However, Stapleton did address the steps law enforcement took—or did not take—following Muniz's arrest.  *See* Cr. Dkt. No. 117 at 131−33, 137−38.  During his cross-examination of Agent Lara, Stapleton emphasized the amount of "correct" and "true" information Muniz provided the officers, while criticizing shortcomings of the investigation.  *Id*.  Stapleton pursued a similar line of questioning with Agent Mihalos.  Cr. Dkt. No. 118 at 129−33.

In addition, Muniz fails to demonstrate how additional arguments on this topic would have impacted the outcome of his trial.  During the trial, multiple agents described the information Muniz disclosed following his arrest.  Cr. Dkt. No. 117 at 90−105, 109−28 (Agent Lara testifying about his ride along with Muniz following Muniz's detention at the United States-Mexico border); Cr. Dkt. No. 118 at 14−17 (Agent Mihalos testifying about Muniz's offer to call the owner of the

vehicle).   Agent Mihalos also testified that, based on all of the information that Muniz provided them, officers were not able to locate the man known to Muniz as "Mario Arellano."  Cr. Dkt. No. 118 at 38.   He testified about the "multiple leads" they received based on information Muniz provided.  *Id.* at 45, 131−32.   Muniz himself also testified about his offers to help law enforcement officials locate the owner of the van.  *Id.* at 192−93.   Jurors, therefore, received evidence about the investigation, and were able to draw conclusions about the actions of law enforcement.   Muniz has not demonstrated that, if Stapleton had made this argument more explicitly, there is a reasonable probability that the outcome of his trial would have been different.

## V.    Conclusion

Muniz is not entitled to relief based on any of the claims in his § 2255 Motion and supporting documents.   Even if all the facts contained in Muniz's Motion were demonstrable and true, he would not be entitled to relief.   Accordingly, he is not entitled to an evidentiary hearing, and his claims should be dismissed with prejudice.  *See Clark v. Collins*, 19 F.3d 959, 964 (5th Cir. 1994) ("The district court need not hold an evidentiary hearing to resolve ineffective assistance claims where the [movant] has failed to allege facts which, if proved, would admit of relief or where the [court's] record suffices for their disposition.") (internal citations omitted); *United States v. Fields*, 565 F.3d 290, 298 (5th Cir. 2009) ("If, on the record before us, we can conclude as a matter of law that [the movant] cannot establish one or both of the elements necessary to establish his constitutional claim [for ineffective

assistance of counsel], then an evidentiary hearing is not necessary[.]") (internal citation omitted).

## VI.   Certificate of Appealability

A certificate of appealability shall not issue unless the movant makes "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2). This requires a "showing that reasonable jurists could debate whether (or, for that matter, agree that) the [§ 2255 motion] should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further."  *Slack v. McDaniel*, 529 U.S. 473, 475, 120 S. Ct. 1595, 146 L. Ed. 2d 542 (2000) (internal quotations and citations omitted).  Stated differently, where claims have been dismissed on the merits, the movant "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Id.* at 484.  Where claims have been dismissed on procedural grounds, the movant must show that "jurists of reason would find it debatable whether the [§ 2255 motion] states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  *Id.*

District courts may deny certificates of appealability sua sponte, without requiring further briefing or argument.  *Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000).  A certificate of appealability should not issue in this case because Muniz has not made a substantial showing of the denial of a constitutional right.

## VII.   Recommendation

For the foregoing reasons, it is recommended that the Court **DISMISS** Muniz's Motion with prejudice and direct the Clerk of Court to close this case.  It is further recommended that a certificate of appealability not issue.

## VIII. Notice to Parties

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*; 28 U.S.C. § 636(b)(1).

SIGNED on this 31st day of July, 2019, at Brownsville, Texas.

_____

**Ignacio Torteya, III**
**United States Magistrate Judge**